

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| KIMBERLY BOGARDUS, | ) | |
| | ) | No. 40060-3-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| CITY OF YAKIMA, a Washington | ) | |
| Municipal Corporation, | ) | |
| | ) | |
| Respondent. | ) | |

COONEY, J. — In an amended complaint, Kimberly Bogardus sued the City of

Yakima (City) under the Washington Law Against Discrimination (WLAD) and for

Wrongful Discharge in Violation of Public Policy (WDVPP). Her claims stem from the

City's termination of her employment. The trial court dismissed Ms. Bogardus' amended

complaint on the City's motion for summary judgment.

Ms. Bogardus appeals the trial court's order on summary judgment. We affirm.

BACKGROUND

In 2003, Ms. Bogardus was hired as a transit operator[1] for the City. During her time as a transit operator, Ms. Bogardus experienced "migraine headaches for which she sought leave." Clerk's Papers (CP) at 133. Due to her migraines, Ms. Bogardus worked with the City on her Family Medical Leave Act (FMLA) certification.

In October 2016, Ms. Bogardus was re-certified for FMLA leave for her migraines that occurred "1-3 times per week/1 day per episode." CP at 133. Because Ms. Bogardus had previously exceeded her allowed FMLA leave, the City required re-certification every 30 days. Ms. Bogardus was re-certified for FMLA leave in November 2016, January 2017, March 2017, March 2018, September 2018, and March 2019. Between 2016 and her termination on August 27, 2020, Ms. Bogardus had exhausted her annual allotment of 480 hours of FMLA leave. Ms. Bogardus used a total of 3,437.25 hours of leave during that period.

On some occasions, Ms. Bogardus had exhausted her allotted leave hours, did not request additional unpaid leave, and did not report to work. These deficiencies resulted in Ms. Bogardus being in an "unauthorized leave without pay status." CP at 134. Ms. Bogardus admitted at her deposition that she did not have "regular and reliable

---

[1] The position of transit operator required Ms. Bogardus to "operate[ ] a City bus" to "transport passengers over local routes according to prescribed time schedules." CP at 277.

2

attendance," an essential function of the transit operator position. CP at 567, 133. She also admitted to not informing the City that she believed "being bounced around" while driving a bus all day triggered her migraines. CP at 550. Ms. Bogardus confessed that neither she nor her doctors knew why and when she would experience a migraine.

Due to Ms. Bogardus' apparent need for a more flexible schedule, the City offered her an "extra board" position. CP at 222, 430, 563. The "extra board" position is "for bus drivers, and so they are not put specifically on the schedule. They are—they're requested to work certain shifts whether there's an opening or there's a need" and allows the driver to "either accept the shift or decline the shift." CP at 605. Ms. Bogardus declined this position because "I have bills to pay. So I needed to take what I could because I needed the income to pay for my bills and insurance." CP at 552.

Ms. Bogardus was eventually disciplined because she had exhausted her leave hours and, though remaining absent from work, failed to request additional unpaid leave "in accordance with City policy." CP at 134. Ms. Bogardus received an oral reprimand in November 2016 and a written reprimand in February 2017 for "us[ing] more leave time than allowable per her approved FMLA allocation" and failing to "request additional unpaid leave in accordance with City policy—placing her in an unauthorized leave without pay status." CP at 134. Ms. Bogardus again entered an unauthorized "leave without pay status" in 2018 and was issued a suspension for 40-hours without pay for the policy violation. CP at 135.

In 2020, Washington's State Paid Family and Medical Leave Act (PFMLA) took effect. Ms. Bogardus applied for and was approved for PFMLA benefits for the 2020 calendar year. Between April 20 and July 13, 2020, Ms. Bogardus called in daily to inform the City that she would not be coming to work but would instead be using PFMLA leave.

On July 6, 2020 when her PFMLA leave was nearly exhausted, the City sent a letter to Ms. Bogardus stating it was scheduling a meeting for July 20, 2020, to discuss her medical condition, limitations, and ways in which the City could help her improve her attendance. Ms. Bogardus, her union representative, and representatives from the City attended the meeting. The City and Ms. Bogardus again discussed the extra board position, but Ms. Bogardus was not interested. The City encouraged Ms. Bogardus to "come up with alternative accommodations that she believed would work for her." CP at 136, 221. She was also reminded of the City's leave without pay policy that she had previously violated.

By the end of July, Ms. Bogardus depleted her PFMLA leave. On August 4 and 5, 2020, she did not report to work despite having exhausted all of her leave, putting her in an unauthorized leave without pay status once again. A pre-disciplinary hearing was held in late August to address the issue. Ms. Bogardus claimed at that hearing that she had checked her computer on August 3 and believed she had accrued leave, but the leave she thought she had accrued had disappeared when she looked again on August 4.

On August 27, 2020, Ms. Bogardus was terminated by the Interim City Manager,

Alex Meyerhoff. The four-page termination letter explained that Ms. Bogardus was

being terminated because she called out of work on August 4 and 5, despite not having

"sufficient leave accruals to cover these two days of absence" therefore leaving her in an

"unauthorized leave without pay" status. CP at 186. The letter noted that she had been

disciplined numerous times for this same violation. Mr. Meyerhoff stated in the letter

that he found her proffered excuses at the disciplinary hearing "not credible." CP at 187.

Ms. Bogardus was alleged to have violated City of Yakima Transit Operations

Policy and Procedures Manual Section 2.6(3), which states:

> Each employee shall be held responsible for tracking and knowing the
> amount of accrued leave to which they are entitled to assure coverage of all
> requested leave time. Taking leave without sufficient accrued leave to cover
> the time taken off is considered an unauthorized absence and subject to
> disciplinary action.

CP at 187. The termination letter also noted Ms. Bogardus violated City of Yakima

General Civil Service Rules and Regulations, Chapter IX, Section (A)(1) for which

discipline is appropriate for "dereliction of duty." CP at 187. Finally, the letter stated

Ms. Bogardus had violated City of Yakima Administrative Policy Nos. 1-100 by taking

"[u]nauthorized absence from the job" and "[u]nauthorized or improper use of any type

of leave." CP at 187.

Following her termination, the City learned Ms. Bogardus had applied for full and

permanent disability benefits with the Social Security Administration (SSA), stating on

5

the application that she had stopped working on April 17, 2020. Her application was granted effective April 17, 2020, approximately four months prior to her termination.

In January 2021, Ms. Bogardus filed suit against the City and individual defendants. In her original complaint, Ms. Bogardus asserted claims for (1) "Violation of Washington State Law Against Discrimination," including disparate treatment, retaliation, and failure to engage in the interactive process; (2) "Willful Violation of the Washington State Family Leave Act (WFLA);" (3) "Hostile Work Environment in Violation of WLAD;" (4) "Wrongful Termination in Violation of Public Policy;" and (5) "Intentional infliction of physical injury and aggravation." CP at 6-7.

In 2023, the City moved for summary judgment dismissal of all of Ms. Bogardus' claims. In response to the City's motion, Ms. Bogardus indicated that she intended to dismiss her claims for WFLA, hostile work environment, and intentional infliction of physical injury. Ms. Bogardus also noted an intention to dismiss her claims against "Each Individual Defendant" and asserted that her WDVPP claim was not addressed in the City's motion and was therefore not subject to summary judgment.[2] CP at 456.

Ms. Bogardus moved to continue the City's motion for summary judgment. Following a hearing on her motion, the court issued an order stating, "Plaintiff indicates

---

[2] Despite this assertion, the City *did* move for summary judgment dismissal of Ms. Bogardus' WDVPP claim, dedicating a page and a half of argument to it in its opening brief.

6

intent to dismiss all but 3 theories of complaint and will dismiss against all defendants but City of Yakima." CP at 248. Thereafter, Ms. Bogardus filed an amended complaint naming only the City as a defendant and asserting claims for violating the WLAD and for WDVPP.

Following a hearing on September 28, 2023, the court granted the City's motion for summary judgment and dismissed Ms. Bogardus' claims with prejudice.

Ms. Bogardus timely appeals.

ANALYSIS

We review orders on summary judgment de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Summary judgment is only appropriate if there are no genuine issues of material fact, and "the moving party is entitled to judgment as a matter of law." *Id.*; CR 56(c). The moving party bears the initial burden of establishing that there are no disputed issues of material fact. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). "A material fact is one upon which the outcome of the litigation depends in whole or in part." *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990).

When considering a motion for summary judgment, evidence is considered in a light most favorable to the nonmoving party, here, Ms. Bogardus. *Keck*, 184 Wn.2d at 370. If the moving party satisfies its burden, then the burden shifts to the nonmoving party to establish there is a genuine issue for the trier of fact. *Young*, 112 Wn.2d at 225-

26. While questions of fact are typically left to the trial process, they may be treated as a matter of law if "reasonable minds could reach but one conclusion." *Hartley v. State*, 103 Wn.2d 768, 775, 698 P.2d 77 (1985).

A nonmoving party may not rely on speculation or having its own affidavits accepted at face value. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). Instead, a nonmoving party must put "forth specific facts that sufficiently rebut the moving party's contentions and disclose that a genuine issue as to a material fact exists." *Id.*

WLAD—FAILURE TO ACCOMMODATE

Ms. Bogardus argues summary judgment in favor of the City was erroneous because the City failed to accommodate her in violation of the WLAD. The City contends that judicial estoppel bars Ms. Bogardus' claims under the WLAD. We agree with the City.

The WLAD prohibits an employer from discharging an employee "because of . . . the presence of any sensory, mental, or physical disability." RCW 49.60.180(2). To prevail on a failure to accommodate claim, a plaintiff must prove: (1) "the employee had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform their job[;]" (2) "*the employee was qualified to perform the essential functions of the job*[;]" (3) the employee gave the employer notice of the abnormality and its resulting substantial limitations; and (4) upon receiving notice, the employer failed to adopt

8

measures that were available to the employer and that were medically necessary to accommodate the employee's abnormality. *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 532, 70 P.3d 126 (2003) (emphasis in original).

The term "essential functions" as used in element (2) is "derived from WLAD's federal counterpart, the Americans with Disabilities Act (ADA)."[3] *Id.* at 533. "While the question of whether an employer adequately accommodated an employee normally presents a factual question for a jury to decide, summary judgment is appropriate on a WLAD accommodation claim when reasonable minds could reach but one conclusion." *Slack v. Luke*, 192 Wn. App. 909, 919, 370 P.3d 49 (2016).

"'Judicial estoppel is an equitable doctrine that precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position.'" *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007) (quoting *Bartley-Williams v. Kendall*, 134 Wn. App 95, 98, 138 P.3d 1103 (2006)). Three factors guide a court's determination of whether to apply the doctrine of judicial estoppel: (1) whether the party's later position is "clearly inconsistent with its earlier position[;]" (2) whether acceptance of the "inconsistent position in a later

---

[3] "'The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Davis*, 149 Wn.2d at 533 n.5 (quoting 42 U.S.C. § 12111(8)).

proceeding would create the 'perception that the first or second court was misled[;]'" and (3) whether the party asserting the inconsistent position would receive an unfair advantage or impose an unfair disadvantage on the opposing party if not estopped. *Id.* at 538.

In *Cleveland v. Policy Management Systems, Corporation*, the United States Supreme Court held:

> [P]ursuit, and receipt, of [Social Security Disability Insurance (SSDI)] benefits does not *automatically* estop a recipient from pursuing an ADA claim. Nor does the law erect a strong presumption against the recipient's success under the ADA. Nonetheless, an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work. To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could "perform the essential functions" of her previous job, at least with "reasonable accommodation."

526 U.S. 795, 797-98, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999) (emphasis added). The Supreme Court explained "a plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation." *Id.* at 806. This is because an ADA plaintiff "bears the burden of proving that she is a 'qualified individual with a disability'—that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of her job." *Id.* at 806.

In essence, the Court held a plaintiff's assertion that they cannot work in an SSDI application does not inevitably result in them being estopped from asserting an ADA

10

claim, but it can if the plaintiff does not provide an explanation for why both of their positions are consistent with one another.

Here, Ms. Bogardus offered no explanation for why or how her assertion in her SSDI application that she was too disabled to work could be reconciled with her later position that she could, in fact, work had the City offered her a reasonable accommodation. Her SSDI application negates element (2) of her WLAD failure to accommodate claim—that she was qualified to perform the essential functions of the job. Because she provides no explanation for her contrary positions, her accommodation claim cannot survive the City's summary judgment motion.

WLAD—RETALIATION

Ms. Bogardus argues that her WLAD retaliation claim was improperly dismissed on summary judgment. However, aside from reciting the legal standard for such a claim, she provides no argument or analysis explaining why her claim was improperly dismissed. For this reason, we decline to address this issue. *State v. Stubbs*, 144 Wn. App. 644, 652, 184 P.3d 660 (2008) ("Passing treatment of an issue or lack of reasoned argument is insufficient to allow for our meaningful review."), *rev'd on other grounds by* 170 Wn.2d 117, 240 P.3d 143 (2010).

WDVPP CLAIM

Ms. Bogardus argues her WDVPP claim was erroneously dismissed on summary

judgment.[4]  We disagree.

To establish a prima facie case under the WDVPP, an employee must

demonstrate: (1) her discharge may have been motivated by reasons that contravene a

clear public policy, and (2) the employee's public-policy linked conduct was a significant

factor in the decision to terminate the employee.  *Mackey v. Home Depot USA, Inc.*, 12

Wn. App. 2d 557, 577-78, 459 P.3d 371 (2020).

A WDVPP claim is typically limited to four scenarios: (1) when the discharge was

a result of the employee refusing to commit an illegal act (e.g. refusing to engage in price

fixing); (2) when the discharge was a result of the employee performing a public duty or

obligation (e.g., jury duty); (3) when the termination resulted due to an employee

exercising a legal right or privilege (e.g., filing a worker's compensation claim); and

---

[4] The City contends that though it moved for summary judgment dismissal of Ms. Bogardus' WDVPP claim, Ms. Bogardus did not substantively respond to its argument below.  In moving for summary judgment, the City bore the initial burden of proving the absence of a genuine issue of material fact related to Ms. Bogardus' WDVPP claim.  After making this showing, the burden shifted to Ms. Bogardus to present evidence demonstrating the presence of a genuine issue of material fact.  In not responding to the City's argument, Ms. Bogardus failed to meet her burden. Notwithstanding Ms. Bogardus' deficiency, because we review the trial court's order de novo, we exercise our discretion and review her claimed error.

(4) where the discharge is premised on an employee "whistleblowing." *Dicomes v. State*, 113 Wn.2d 612, 618, 782 P.2d 1002 (1989).

Upon the employee making a prima facie case of WDVPP, the burden shifts to the employer to "'articulate a legitimate, nondiscriminatory reason'" for the employee's termination. *Mackey*, 12 Wn. App. 2d at 571 (quoting *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 180 Wn.2d 516, 527, 404 P.3d 464 (2017)). If the employer meets its burden, the employee "must produce sufficient evidence showing that the employer's alleged nondiscriminatory reason for the discharge was a 'pretext.'" *Id.* at 572 (quoting *Mikkelsen,* 180 Wn.2d at 527). "'An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer.'" *Mikkelsen*, 180 Wn.2d at 527 (quoting *Scrivener v. Clark College*, 181 Wn.2d 439, 446-47, 334 P.3d 541 (2014)).

In order to defeat summary judgment, the employee must show only that a reasonable trier of fact could find that discrimination was a substantial factor in the employer's decision to discharge the employee. *Id*. at 528.

Here, Ms. Bogardus' WDVPP claim is premised on two legal rights she exercised: requesting a reasonable accommodation and taking protected leave. However, there is no evidence that this conduct was a significant factor in her termination. Indeed, Ms.

Bogardus' termination letter articulated multiple reasons for her discharge, including: violations of the City of Yakima Transit Operations Policy and Procedures Manual's rules for how to take time off; violation of City of Yakima General Civil Service Rules and Regulations, namely "dereliction of duty;" and violations of City of Yakima Administrative Policies for "[u]nauthorized absence from job" and "[u]nauthorized or improper use of any type of leave." CP at 186-87. The letter clearly expressed that Ms. Bogardus was not being terminated for using protected leave, but instead for being in an "unauthorized leave without pay status" for which she had been disciplined prior. CP at 186.

Ms. Bogardus is unable to direct this court to any evidence in the record that indicates discrimination was a factor in her termination. Rather, her argument is limited to the City "openly admit[ing] in their discipline and termination letters that their reason for reprimanding and terminating [Ms. Bogardus] was due to time off that she took as an accommodation and protected time off for her disability." Appellant's Am. Open. Br. at 16. She provides no citation to the record supporting her argument, and the letter itself clearly contradicts her unsupported statement. Consequently, there is an absence of any genuine issue of material fact related to her WDVPP claim, and it was properly dismissed on summary judgment.

WFLA CLAIM

Ms. Bogardus argues the trial court improperly dismissed her WFLA claim. The City responds that it was Ms. Bogardus, not the trial court, who voluntarily dismissed her WFLA claim. We agree with the City.

In Ms. Bogardus' response to the City's motion for summary judgment, she wrote "Plaintiff Intends to Dismiss her Claim for Willful Violation of Washington State Family Leave Act." CP at 455. On September 26, 2023, Ms. Bogardus filed a first amended complaint that did not include a claim for a violation of the WFLA. If an amended complaint "abandons a former theory or cause of action, it does not relate back to the original complaint, but, instead, rests the action upon the pleadings as amended." *Ennis v. Ring*, 49 Wn.2d 284, 288, 300 P.2d 773 (1956). Because Ms. Bogardus voluntarily dismissed her claim for violation of the WFLA, we decline review.

ATTORNEY FEES

Ms. Bogardus requests her attorney fees pursuant to RAP 18.1 and RCW 49.48.030. RCW 49.48.030 provides: "In any action in which any person *is successful in recovering judgment for wages or salary owed to him or her*, reasonable attorney's fees, in an amount to be determined by the court, shall be assessed against said employer or former employer." (emphasis added). Because Ms. Bogardus has not been successful in recovering judgment for wages or salary owed to her, she is not entitled to her attorney fees on appeal.

15

No. 40060-3-III
*Bogardus v. City of Yakima*


Affirmed.

A majority of the panel has determined this opinion will not be printed in

the Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.


_____
Johnson, J.P.T.[†]

---

[†] Brandon L. Johnson, an active judge of a court of general jurisdiction, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).